# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 11-1218

_____

Christopher Kennedy,                                  *
                                                      *
        Petitioner-Appellant,                  *
                                                      *    Appeal from the United States
    v.                                              *    District Court for the Western
                                                      *    District of Missouri.
Mike Kemna,                                           *
                                                      *
        Respondent-Appellee.                   *

_____

Submitted: September 19, 2011
Filed: January 20, 2012

_____

Before LOKEN, BEAM, and MURPHY, Circuit Judges.

_____

BEAM, Circuit Judge.

      Christopher Kennedy appeals the district court's[1] denial of his 28 U.S.C. § 2254 petition for habeas corpus. The district court certified nine claims for appeal and, upon review of these claims, we affirm the denial of relief.

## I.    BACKGROUND

      The evidence at trial revealed that, on the evening of October 3, 1999, Frederick Darrington, and brothers Ryan, Rodja, and Raphael Pearson attended a comedy show

---

[1]The Honorable Howard F. Sachs, United States District Judge for the Western District of Missouri.

at the Beaumont Club in Kansas City, Missouri. After the show, Darrington and the Pearsons left the club and were ambushed by two gunmen. Darrington and Ryan Pearson suffered mortal gunshot wounds, Rodja Pearson was shot in the leg and survived, and Raphael Pearson escaped without injury. A nearby shopkeeper, Philip Bender, received a non-life-threatening gunshot wound to the arm. At the scene, officers located spent .38 caliber bullets and 9mm shell casings, but no firearms were recovered.

The morning after the shooting, Rodja Pearson (who died before trial due to unrelated causes) identified Kennedy as one of the shooters during a police interview.[2] Investigators then created a photo lineup including a picture of Kennedy and showed it to Darren Miller, an innocent bystander who witnessed the shooting. Miller, who did not know Kennedy, identified Kennedy as the shooter in the lineup and explained at trial that he observed the shooter's face for about fifteen to thirty seconds from a distance of four to five feet. Miller unwaveringly testified that he was "positive" Kennedy was the shooter. Raphael Pearson, who had previously known Kennedy as a "drinking buddy," also identified Kennedy in a photo lineup and testified that he had "no doubt" that Kennedy was the shooter.[3] Raphael also asserted that he saw Kennedy in the Beaumont Club before the shooting. Bender testified that he did not get a good look at the shooter, but stated that the shooter was approximately six feet tall and "on the heavy side." At the time of the shooting, Kennedy was six feet tall and weighed approximately 250 pounds.

---

[2]Rodja's identification of Kennedy was introduced at trial through a police officer's testimony, over Kennedy's hearsay objection, for the limited purpose of explaining subsequent police action.

[3]Although the shooting took place at night, Miller testified that "the illumination was fine" and Raphael similarly testified, "There were two large street lamps. I could see clearly."

Over Kennedy's objection, the state also introduced evidence that, in 1992, Kennedy and his "cousin through marriage" were shot inside Rodja Pearson's house. After taking the stand, Kennedy explained that he was shot five or six times during the incident, but asserted that he was shot by someone other than Rodja Pearson. Kennedy conceded, however, that his cousin was shot and killed by Rodja during the same attack. Police identified Rodja and another man as suspects in the crime, but no charges were ever filed.

Kennedy, through counsel Frank Smith, presented an alibi defense at trial. Specifically, Kennedy called his girlfriend, Sherice Banks, and her friend, Tova Jefferson, to testify that Kennedy was with Banks at a Kansas City hotel at the time of the shooting. Jefferson explained that she drove Banks to the hotel at about 7:00 p.m. on the night of the shooting, and Banks verified that she remained with Kennedy inside the hotel until the next morning. A hotel employee, Kelly Kun, also testified that Kennedy frequently stayed at the hotel but she had not checked hotel records to determine whether he was registered at the hotel on the date of the shooting. Finally, Kennedy took the stand and asserted that he was with Banks at the hotel when the shooting occurred.

After hearing such evidence, the jury convicted Kennedy of two counts of second-degree murder, one count of first-degree assault, and three counts of armed criminal action, and Kennedy was sentenced to life imprisonment. The Missouri Court of Appeals affirmed Kennedy's conviction and sentence on direct appeal. State v. Kennedy, 107 S.W.3d 306 (Mo. Ct. App. 2003). Kennedy's Rule 29.15 motion for post-conviction relief, in which he raised numerous claims of ineffective assistance of counsel, was also denied by the trial court, and the denial was affirmed on appeal. Kennedy v. State, 199 S.W.3d 830 (Mo. Ct. App. 2006) (per curiam).

In his petition for habeas corpus relief, Kennedy raised numerous claims. The district court denied the petition, and the following claims are certified for appeal:

(Claim 1) an ineffective assistance claim regarding trial counsel's failure to investigate or present ballistics evidence; (Claim 2) a conflict-of-interest claim based on the conflict of a member of the defense team; (Claim 3) an ineffective assistance claim regarding trial counsel's preparation and presentation of alibi witnesses; (Claim 4) a confrontation claim based on the introduction of Rodja Pearson's out-of-court identification of Kennedy at trial and an ineffective assistance claim regarding trial counsel's failure to properly object to such testimony; (Claim 5) a prosecutorial misconduct claim pertaining to statements made during closing arguments and an ineffective assistance claim based on trial counsel's failure to properly object to such comments; (Claim 6) an ineffective assistance claim based on trial counsel's failure to effectively impeach Raphael Pearson; (Claim 7) an ineffective assistance claim regarding trial counsel's failure to disclose the extent of his health problems to Kennedy; (Claim 8) an ineffective assistance claim based on trial counsel's failure to object to the prosecutor's cross-examination of Sherice Banks; and (Claim 9) a claim asserting that the cumulative effect of trial counsel's errors denied Kennedy the right to a fair trial and that trial counsel's failure to preserve issues in trial court prejudiced the outcome of Kennedy's direct appeal.

## II.    DISCUSSION

In this habeas corpus action, we review the district court's legal conclusions de novo and its factual findings for clear error. Cole v. Roper, 623 F.3d 1183, 1187 (8th Cir. 2010), cert. denied, 132 S. Ct. 147 (2011). Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), we may not grant relief for claims adjudicated on the merits in state court unless the adjudication was contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent, or was an unreasonable determination of the facts in light of the evidence presented in state court. 28 U.S.C. § 2254(d). Importantly, "[a] state court decision may be incorrect, yet still not unreasonable, and we will grant relief only if the state court decision is

-4-

both incorrect *and* unreasonable." <u>Cole</u>, 623 F.3d at 1187 (emphasis in original).


### A.    Trial Counsel's Failure to Investigate or Present Ballistics Evidence (Claim 1)

Kennedy contends that trial counsel, Frank Smith, rendered ineffective assistance because he failed to investigate or present ballistics evidence linking one of the murder weapons to a previous shooting that did not involve Kennedy. Ineffective assistance of counsel claims are governed by the performance and prejudice standards set forth in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984). Specifically, to prevail on an ineffective assistance claim, a defendant must demonstrate (1) that "counsel's representation fell below an objective standard of reasonableness," <u>id.</u> at 688; and (2) "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," <u>id.</u> at 694. Under the prejudice prong, "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Id.</u>

Before trial, Smith received police reports stating that the 9mm shell casings recovered at the scene of the shooting matched casings recovered at the scene of a shooting that occurred a year before. According to the reports, in October 1998, Jermaine Mitchell and Kareem Johnson confronted a man in Kansas City, Missouri, who had previously assaulted Mitchell. Mitchell told investigators that Johnson gave him a 9mm handgun and he fired it in the air multiple times before giving the gun back to Johnson. Johnson confirmed to investigators that he was with Mitchell at the time, but he denied giving Mitchell a handgun and stated that no shots were fired. Smith did not attempt to introduce such evidence at trial. At Kennedy's Rule 29.15 hearing, Smith discounted the probative value of the reports, testifying that, in his experience, handguns are often exchanged between individuals.

The Missouri Court of Appeals denied relief on this point, holding that Kennedy failed to demonstrate Strickland prejudice. See id. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed."). The court emphasized the strength of the state's case at trial and that the ballistics evidence is, at best, minimally probative. As stated above, our question under § 2254(d) is "not whether [we] believe[] the state court's determination under the Strickland standard was incorrect but whether that determination was unreasonable–a substantially higher threshhold." Knowles v. Mirzayance, 129 S. Ct. 1411, 1420 (2009) (internal quotations omitted).

The Missouri Court of Appeals' adjudication of this claim was not an unreasonable application of, nor was it contrary to, Strickland. Kennedy asserts that if Smith would have further investigated the police reports in his possession, he would have discovered additional ballistics reports that also connected the murder weapon to the 1998 assault. But, the Missouri Court of Appeals reasonably concluded that such evidence is minimally probative. Indeed, the reports only reveal that *one* of the weapons used in the instant shooting was in the possession of other individuals *a year before*. Smith explained during the post-conviction hearing that individuals often exchange handguns and the police reports lend some support to this point, indicating that Mitchell borrowed Johnson's handgun during the 1998 shooting. And, Kennedy did not call Mitchell or Johnson to testify at his post-conviction hearing or otherwise attempt to directly link them to the instant shooting.[4]

In addition, the Missouri Court of Appeals reasonably concluded that the state's case against Kennedy was strong. Kennedy attempts to discount the weight of the

[4]We assume without deciding that the 1998 ballistics evidence would have been admissible at trial. But, we note that, under Missouri law, "evidence which can have no other effect than to cast a bare suspicion on another, or to raise a conjectural inference as to the commission of the crime by another, is not admissible." State v. Umfrees, 433 S.W.2d 284, 288 (Mo. 1968) (en banc) (quotation omitted).

evidence stacked against him by emphasizing that he was only positively identified by two eyewitnesses. But, reducing the state's case to a mere headcount of eyewitnesses fails to take into account the particulars of the evidence introduced at trial. See, e.g., Morales v. Johnson, 659 F.3d 588, 601-02 (7th Cir. 2011) (finding substantial evidence of guilt on habeas review where two eyewitnesses, who were familiar with the defendant and had "ample opportunity" to observe the shooter, identified the defendant as the shooter). Indeed, Darren Miller witnessed the shooter's face for up to thirty seconds from a mere four to five feet away and unequivocally testified that he was "positive" Kennedy was the shooter. Raphael Pearson knew Kennedy and also unwaveringly testified that he had "no doubt" Kennedy was the shooter. See id. at 601 ("The prosecutor presented eyewitness testimony from not just one, but two eyewitnesses. Each witness's identification of . . . the shooter corroborated the other's testimony."). In addition, a third eyewitness, Philip Bender, gave a general description of the shooter that matched Kennedy's physical characteristics at the time of the shooting. And, Kennedy had a motive based on the fact that Rodja Pearson shot and killed Kennedy's cousin in 1992, and Kennedy was shot some six times during the same incident. The district court did not err in denying relief on this point.

## B.    Counsel's Handling of Alibi Witnesses (Claim 3)

Next, Kennedy claims that Smith deficiently handled and presented Kennedy's alibi witnesses. Before trial, Kennedy hired private investigator John Weaver for the purpose of interviewing Kennedy's alibi witnesses, Tova Jefferson and Sherice Banks. Weaver interviewed Jefferson and Banks and the state sought to depose these witnesses. Smith was unable to attend the depositions and sent Weaver in his place, but it is unclear how Smith directed Weaver to proceed. At the Rule 29.15 hearing, Smith asserted that he told Weaver to postpone the depositions but Weaver indicated that he was sent to passively observe the depositions. Regardless of what was supposed to happen, Smith did not prepare the witnesses for the depositions, attend

the depositions, or review the witnesses' statements before trial. During the depositions, Jefferson insisted that she drove Banks to a hotel to meet with Kennedy sometime in November 1999. Banks stated in her deposition that she knew she was with Kennedy on the night of the shooting, but she could not remember the specific date. At trial, both witnesses testified that Banks was with Kennedy on the night of October 3, 1999, and the state used the conflicting statements in their depositions for impeachment purposes. On re-direct, Jefferson explained that she mixed up the dates during her deposition because she was nervous. Banks similarly testified that she simply made a mistake when she failed to remember the specific date during her deposition.

Kennedy asserts that, if Smith had properly prepared the alibi witnesses for their depositions, the impeachment material regarding the witnesses' confusion about dates would have never existed. Alternatively, Kennedy avers that, if these witnesses had still confused the dates during their depositions, a reasonably competent attorney would have abandoned the alibi defense and introduced the ballistics evidence discussed above in an effort to assert a reasonable doubt/mistaken identity defense. The Missouri Court of Appeals denied relief on this point, holding that Kennedy failed to establish <u>Strickland</u> prejudice. While doing so, the court emphasized that there was nothing in the record to suggest that Jefferson and Banks would have remembered relevant dates during their depositions if Smith had acted differently.

The Missouri Court of Appeals' adjudication of this claim was not an unreasonable application of, nor was it contrary to, <u>Strickland</u>. Kennedy's theory of prejudice is rife with speculation. <u>See</u> <u>Sanders v. Trickey</u>, 875 F.2d 205, 210 (8th Cir. 1989) (mere speculation does not satisfy <u>Strickland</u>'s prejudice standard). Kennedy did not call Jefferson or Banks to testify at his post-conviction hearing and, as the state court pointed out, the record does not suggest that they would have remembered relevant dates at their depositions if Smith had acted differently. Kennedy's contention that Smith could or should have abandoned the alibi defense and relied

instead upon the ballistics evidence is also unpersuasive. As discussed above, the ballistics evidence was minimally probative, at best, and the evidence of Kennedy's guilt was strong. The district court did not err in denying relief on this point.

## C.      Conflict of Interest (Claim 2)

Kennedy also claims that a conflict of interest adversely affected his representation. As stated above, Smith hired Weaver, a non-attorney, to contact and interview alibi witnesses. Sometime after Weaver finished such duties, his daughter's common-law husband was murdered in a house rented by Kennedy, and Kennedy soon became a suspect in that murder. Weaver informed Kennedy and Smith of his relationship to the murder victim and Weaver explained that he would stop working on Kennedy's case. While Weaver conducted no investigative work on the case after that point, he did passively observe the depositions of the alibi witnesses.

Kennedy asserts that a conflict arising out of Weaver's involvement on the defense team resulted in Smith's mishandling of the alibi witnesses and, ultimately, Smith's presentation of a counterproductive alibi defense at trial. To support this claim, Kennedy relies on Cuyler v. Sullivan, 446 U.S. 335, 348 (1980), where the Court ruled that, "[i]n order to establish a violation of the Sixth Amendment, a defendant who raised no objection [to the conflict] at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." The Missouri Court of Appeals denied relief on this point, holding that Kennedy failed to demonstrate that the alleged conflict adversely affected Kennedy's representation. In doing so, the court assumed without deciding that a conflict on the part of Weaver, a non-attorney member of the defense team, could violate the Sixth Amendment.

The Missouri Court of Appeals' adjudication of this claim was not an unreasonable application of, nor was it contrary to, Cuyler. After the alleged conflict arose, Weaver's participation on the defense team was limited to passively attending

the depositions of the alibi witnesses. Kennedy emphasizes that Smith and Weaver were not on the same page regarding how Weaver was supposed to proceed at the depositions and that Smith apparently did not discover that the witnesses were deposed until trial. But, without more, it was not unreasonable for the state court to conclude that Kennedy failed to establish a causal link between the alleged conflict and the alleged deficiencies in Kennedy's representation. See Koste v. Dormire, 345 F.3d 974, 983 (8th Cir. 2003) (affirming denial of habeas relief where petitioner failed to show that any deficiency in counsel's performance was causally connected to the alleged conflict). The district court did not err in denying relief on this point.

**D.** **Admission of Rodja Pearson's Identification of Kennedy at Trial (Claim 4)**

As stated above, Rodja Pearson identified Kennedy as the shooter during a police interview but died before trial due to unrelated circumstances. At trial, the state attempted to admit Rodja's identification through the testimony of a police officer. Smith objected on hearsay grounds and the trial court agreed that the statement could not be admitted for the truth of the matter asserted. But, the court permitted the state to admit the statement for the limited purpose of explaining subsequent police action. The officer then testified that Rodja identified Kennedy as the shooter and that, based on this information, officers used Kennedy's picture in a photo lineup.

Kennedy first claims that the introduction of Rodja Pearson's statement violated the Confrontation Clause but he concedes that he never raised this claim in state court. "A claim is procedurally defaulted if a habeas petitioner failed to raise it in state proceedings." Wooten v. Norris, 578 F.3d 767, 777 (8th Cir. 2009). That said, "[a] showing of cause and prejudice may serve to excuse a procedural default and open the door to federal review of an applicant's otherwise defaulted claim." Id. Kennedy claims that Smith rendered ineffective assistance when he failed to preserve the confrontation claim at trial and that this error was the "cause" of Kennedy's procedural

-10-

default. But, this argument disregards the fact that Kennedy's appellate counsel, Rebecca Kurz, testified at the Rule 29.15 hearing that she did not challenge the admission of Rodja's statement on direct appeal because, at the time, she thought the trial court correctly decided the issue. Thus, Kennedy has failed to demonstrate that Smith's deficient assistance, if any, caused the procedural default of Kennedy's confrontation claim. Cf. Middleton v. Roper, 455 F.3d 838, 855 (8th Cir. 2006) (explaining that, although a confrontation challenge was not raised in Missouri trial court, the claim was raised in petitioner's brief on direct appeal and, thus, the claim was "fairly present[ed]" in state court for the purposes of federal habeas review). Kennedy raises no other arguments in favor of excusing procedural default. Therefore, Kennedy's confrontation claim is procedurally barred.

Next, Kennedy argues that Smith was ineffective because he failed to expand upon his general hearsay objection at trial or ask the court to limit the officer's testimony to something like, "After interviewing Rodja Pearson, a photo array was put together and shown to the other eyewitnesses to the homicide." Such a limitation, Kennedy avers, would have permitted the officer to explain subsequent police action without revealing that Rodja identified Kennedy as the shooter. The Missouri Court of Appeals denied relief on this point, concluding that Kennedy failed to demonstrate Strickland prejudice. While doing so, the court emphasized the strength of the state's case and pointed out that, even if the officer's testimony was limited in the manner Kennedy suggests, the jury would have likely presumed that Rodja identified Kennedy as the shooter.

The Missouri Court of Appeals' adjudication of this claim was not an unreasonable application of, nor was it contrary to, Strickland. Kennedy again asserts that, without Rodja's out-of-court statement, this is a mere two-eyewitness case. This argument is unpersuasive for the reasons stated above. See Morales, 659 F.3d at 602 (finding that two strong eyewitness identifications negated any possibility of Strickland prejudice). The district court did not err in denying relief on this point.

## E.     Prosecutors' Statements: Due-Process Claim (Claim 5)

Kennedy asserts that the prosecutors' comments during guilt-phase closing arguments violated his due-process rights under Darden v. Wainwright, 477 U.S. 168 (1986). Specifically, the prosecutors (1) twice referenced Rodja Pearson's identification of Kennedy as direct evidence of Kennedy's guilt, not merely to explain subsequent police action. Smith lodged an objection the second time, which the court sustained, but Smith did not seek further relief. The prosecutors also (2) referred to Smith as "Mr. Talking Loud But Saying Nothing," (3) referred to Kennedy as an evil "executioner," (4) told the jury that it would be "embarrassed" if it acquitted Kennedy, and (5) referenced Kennedy's post-arrest silence. Smith did not object to these statements. On direct appeal, Kennedy sought plain-error review of all of these statements except the comment on Kennedy's post-arrest silence. The Missouri Court of Appeals held that the "executioner" and "Mr. Talking Loud But Saying Nothing" comments were not improper. The court then held that the comments regarding Rodja's statement and juror "embarrassment" were improper but concluded that Kennedy failed to establish "manifest injustice" under plain-error review. While doing so, the court emphasized the strength of the state's case.

Kennedy claims that the prosecutors' comments violated his due-process rights. A prosecutor's improper comments can violate the Fourteenth Amendment if they "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Barnett v. Roper, 541 F.3d 804, 812 (8th Cir. 2008) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974)). "Federal habeas relief should only be granted if the prosecutor's closing argument was so inflammatory and so outrageous that any reasonable trial judge would have *sua sponte* declared a mistrial." James v. Bowersox, 187 F.3d 866, 869 (8th Cir. 1999). And, "[r]elief will be granted only upon a showing of a reasonable probability that the outcome would have been different but for the improper statement[s]." Barnett, 541 F.3d at 813.

As a preliminary matter, we note that Kennedy's due-process claim based on the prosecutor's reference to his post-arrest silence was not presented in state court and, as a result, this claim is barred unless an exception to procedural default applies. Wooten, 578 F.3d at 777 (discussing exceptions to procedural default). Although not discussed by the parties in their briefs before this court, the procedural default issue was raised and briefed before the district court. See King v. Kemna, 266 F.3d 816, 822 (8th Cir. 2001) (en banc) ("[W]e have discretion to consider an issue of procedural default sua sponte."). There, Kennedy asserted that Smith's failure to preserve a challenge to the prosecutor's comment was the "cause" of Kennedy's failure to raise this issue on direct appeal. But, the fact that Kennedy sought plain-error review of the prosecutors' other comments on direct appeal belies this argument. In addition, Kennedy's appellate counsel explained that she did not raise this issue on direct appeal because she thought it lacked merit, not because Smith failed to preserve the issue in trial court.[5] Like Kennedy's confrontation claim, this claim is procedurally barred.

The Missouri Court of Appeals' adjudication of Kennedy's due-process claims based on the prosecutors' other comments was not an unreasonable application of, nor was it contrary to, clearly established Supreme Court precedent. The watershed

---

[5]At the Rule 29.15 hearing, appellate counsel explained that she thought Smith opened the door to the prosecutor's comment on Kennedy's post-arrest silence. At trial, Smith elicited testimony from a police officer on cross-examination that Kennedy did not give a statement to police after his arrest. Then, during closing arguments, Smith explained to the jury, "When Mr. Kennedy surrendered, he made no statement. You will recall the detective saying that because I was with him, and on my advice he made no statement, advice of counsel. . . . As his attorney, I felt it important to ensure that no one knew what our strategy was until we came down to trial." In response to Smith's closing argument, the prosecutor said, "[Smith] tells you that on October 11th he surrenders his client and tells him not to say anything. . . . If the police are accusing you, or you or any of you, of a double murder, you got nothing to say? Incredible. Incredible."

Supreme Court precedent on prosecutorial misconduct is Darden. In Darden, the prosecutor, during guilt-phase closing arguments, implied that death was the only guaranteed means of deterring the defendant, referred to the defendant as an "animal," and stated that he wished the defendant's face had been "blown away by a shotgun." 477 U.S. at 180 n.9-12. The Court held that, while improper, these comments did not render the defendant's trial fundamentally unfair. Id. at 183. While doing so, the Court emphasized that there was significant evidence of the defendant's guilt and that the jury was instructed that closing arguments are not evidence. Id. at 182. Similarly, in this case, while some of the prosecutors' comments may have been improper, the jury was instructed that closing arguments are not evidence and the Missouri Court of Appeals reasonably concluded that there was significant evidence of Kennedy's guilt. The district court did not err in denying relief on this point.

### F.     Prosecutors' Statements: Ineffective Assistance (Claim 5)

Kennedy also claims that Smith rendered ineffective assistance because he failed to timely object to all of the comments discussed in the preceding section, and failed to challenge the statements in a motion for new trial. The Missouri Court of Appeals denied relief on this point, concluding that, even assuming Smith rendered deficient performance, Kennedy failed to establish Strickland prejudice.[6] Given the

---

[6]Kennedy contends that the Missouri Court of Appeals misapplied the Strickland prejudice prong in concluding: "[T]he record simply *does not establish* that the result of the trial would have been different had [objections to the prosecutors' comments] been made." (emphasis added). He properly notes that the Strickland prejudice standard only requires a "reasonable probability" that the result of his trial would have been different absent Smith's alleged errors. However, Kennedy's argument ignores that, in the preceding sentence, the Missouri Court of Appeals properly articulated the Strickland prejudice prong as follows: "The defendant must show there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." The court also properly articulated the Strickland standard elsewhere in its opinion. Under these

significant evidence of Kennedy's guilt, this adjudication was not an unreasonable application of, nor was it contrary to, <u>Strickland</u>. The district court did not err in denying relief on this point.

### G. Cross-Examination of Raphael Pearson (Claim 6)

Next, Kennedy claims that Smith failed to effectively impeach Raphael Pearson. At trial, Raphael explained that he knew Kennedy and that he had "no doubt" that Kennedy was the shooter. Raphael also testified that (1) he was not drinking the night of the shooting; (2) he had stopped drinking "approximately" three years before trial; (3) he called 911 the night of the shooting but was placed on hold; and (4) he first spoke to police four days after the shooting. In light of such testimony, Kennedy argues that Smith should have attempted to impeach Raphael on several grounds. First, Kennedy avers that Smith could have impeached Raphael's testimony that he was not drinking on the night of the shooting with an autopsy report revealing that Raphael's brother, Ryan Pearson, had alcohol in his system at the time of his death. Second, Kennedy contends that Smith should have impeached Raphael's testimony that he had not had a drink in approximately three years with evidence that Raphael was convicted of driving under the influence of alcohol (DUI) in 1999. Third, Kennedy surmises that Smith could have impeached Raphael's testimony that he called 911 on the night of the shooting with the transcript of the 911 tape from that night, which does not document the call. And finally, Kennedy argues that Smith should have emphasized the fact that Raphael did not speak to police until four days after the shooting.

---

circumstances, "we are satisfied that [the court] knew and correctly applied the familiar <u>Strickland</u> prejudice standard" both here and throughout its opinion. <u>White v. Roper</u>, 416 F.3d 728, 732 (8th Cir. 2005).

The Missouri Court of Appeals denied relief on this claim for several reasons. First, the court pointed out that Raphael never testified that his brother, Ryan Pearson, was not drinking the night of the shooting. Thus, the court reasoned, evidence of Ryan Pearson's intoxication would not have impeached Raphael's testimony. Second, the court noted that Raphael was cited for DUI on August 8, 1998, or two years and seven months before trial. Thus, explained the court, evidence that Raphael was cited for DUI in August 1998 would not have effectively impeached Raphael's testimony that he stopped drinking "approximately" three years before trial.[7] Third, the court explained that the 911 transcript arguably would not have impeached Raphael's testimony that he called 911 but was placed on hold. The court reasoned that, based on Raphael's testimony at trial, it is not clear whether Raphael spoke to a dispatcher after he was placed on hold and, if Raphael hung up after being placed on hold, there would be no transcript of his call. The court also concluded that, even if Smith could have impeached Raphael's testimony with the 911 transcript, Kennedy failed to establish prejudice on this point. And finally, the court concluded that Smith was not ineffective for failing to call further attention to Raphael's delay in speaking to police because such testimony would have been cumulative.

The Missouri Court of Appeals' adjudication of this claim was not an unreasonable application of, nor was it contrary to, Strickland. The court reasonably concluded that neither Ryan Pearson's autopsy report nor Raphael's municipal DUI conviction would have impeached Raphael's testimony. In addition, Kennedy's claim that Smith failed to emphasize Raphael's delay in speaking to police is without merit. Contrary to Kennedy's assertions, the record reveals that Smith emphasized the delay

---

[7]The Missouri Court of Appeals assumed arguendo that Raphael's municipal DUI conviction would have been admissible for impeachment purposes. Cf. State v. Albanese, 920 S.W.2d 917, 926 (Mo. Ct. App. 1996) (quotation omitted) ("A party cannot impeach a witness with a municipal ordinance violation."), overruled on other grounds, State v. Beeler, 12 S.W.3d 294 (Mo. 2000) (en banc).

during cross-examination,[8] and, during closing arguments, Smith asked the jury, "Why would [Raphael] wait four days to go to the police when his brother's been seriously injured?" Finally, the Missouri Court of Appeals reasonably found that Kennedy failed to demonstrate that he was prejudiced by Smith's failure to use the 911 transcript differently at trial. As the court pointed out, it is uncertain on this record whether the 911 transcript impeaches Raphael's testimony that he called 911 but was placed on hold. Moreover, Kennedy incorrectly asserts that Smith failed to utilize the 911 transcript to challenge Raphael's testimony. Indeed, Smith asked Raphael on cross-examination whether he called 911 on the night of the shooting, and Raphael asserted that he did. Later, the state published the 911 calls to the jury, and, during closing arguments, Smith emphasized the absence of Raphael's call on the 911 tape to support his argument that "[Raphael] did not make a 911 call." The district court did not err in denying relief on this point.

### H.    Smith's Health Issues (Claim 7)

Kennedy claims that, under Strickland, Smith should have advised Kennedy regarding Smith's various health issues and withdrawn as counsel. While representing Kennedy, Smith suffered from health complications due to diabetes, including vision problems, kidney problems, and high blood pressure. He received two continuances before the start of Kennedy's trial due to illnesses. At the Rule 29.15 hearing, Smith testified that he informed Kennedy about the extent of his health issues and that his ailments did not affect his ability to communicate with Kennedy or prepare for trial. The motion court credited Smith's testimony and denied relief. The Missouri Court

---

[8]Specifically, Smith asked Raphael on cross-examination, "So this occurred on Sunday, October 3rd, and you had no contact with the police before October 7th; is that a fair statement?" Raphael answered, "That is correct, sir. I was at the hospital with my brother on life support all that time." On re-direct, Raphael reiterated that he did not report to police between October 3rd and October 7th because he was at the hospital supporting Ryan, his mother, and his sisters.

of Appeals deferred to the motion court's credibility determination and likewise denied relief.

The Missouri Court of Appeals' adjudication of this claim was not an unreasonable application of, nor was it contrary to, <u>Strickland</u>. While Kennedy attempts to challenge Smith's testimony, we must defer to the credibility determinations of the motion court. <u>Perry v. Kemna</u>, 356 F.3d 880, 885 (8th Cir. 2004). And, on this record, Kennedy's conclusory assertion that Smith's ailments "undoubtedly" caused Smith's alleged deficiencies is unconvincing. The district court did not err in denying relief on this point.

## I.    Cross-Examination of Sherice Banks (Claim 8)

Next, Kennedy claims that Smith deficiently failed to object to the prosecutor's cross-examination of Sherice Banks. On cross-examination, the prosecutor elicited testimony from Banks that she had three children from three different fathers, including Kennedy, and that all of the fathers paid child support except Kennedy. On re-direct, Banks explained that, while Kennedy does not pay court-ordered child support, Kennedy meets his child's needs. The Missouri Court of Appeals denied relief on this claim, holding that, under Missouri law, the prosecutor was permitted to ask questions about Banks's relationship to Kennedy, and that Kennedy failed to demonstrate prejudice because any negative light that Banks's testimony cast on Kennedy or Banks was "exceedingly minimal."

The Missouri Court of Appeals' adjudication of this claim was neither an unreasonable application of, nor was it contrary to, <u>Strickland</u>. Any argument that the Missouri Court of Appeals misapplied Missouri law on this point is not properly before this court. <u>Estelle v. McGuire</u>, 502 U.S. 62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."). In addition, there was significant evidence of Kennedy's guilt

presented at trial, and the court reasonably concluded that any negative light Banks's testimony cast on Kennedy or Banks was minimal. The district court did not err in denying relief on this point.

### J. Cumulative Effect of Counsel's Errors and The Effect of Trial Counsel's Failure to Preserve Issues for Appeal (Claim 9)

Kennedy contends that the Missouri Court of Appeals should have considered the cumulative effect of Smith's errors in determining Strickland prejudice. As Kennedy concedes, our precedent forecloses this claim. Middleton, 455 F.3d at 851.

In addition, Kennedy asserts that the Missouri Court of Appeals' adjudication of his Strickland claims was contrary to Roe v. Flores-Ortega, 528 U.S. 470 (2000), because, in determining prejudice, the court refused to consider how Smith's failure to preserve issues at trial affected the result of Kennedy's direct appeal.[9] See Bode v. State, 203 S.W.3d 262, 269 (Mo. Ct. App. 2006) ("[I]n order to show Strickland prejudice in the context of ineffective assistance of trial counsel, the appellant must show that but for the alleged professional errors of trial counsel, the outcome of his trial would have been different, . . . not the outcome of any direct appeal.").

In Strickland, the Court explained that "the ultimate focus of [the ineffective assistance] inquiry must be on the fundamental fairness of the proceeding whose result is being challenged." 466 U.S. at 696. For example, "[w]hen a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent [counsel's] errors, the factfinder would have had a reasonable doubt respecting guilt." Id. at 695. In Flores-Ortega, the Court considered an "unusual" scenario where counsel breached her duty to consult with the defendant regarding an appeal and failed

---

[9]Specifically, Kennedy points out that Smith failed to properly preserve challenges to (1) the cross-examination of Sherice Banks; (2) the admission of Rodja's out-of-court identification of Kennedy; and (3) the prosecutors' closing arguments.

to file a notice of appeal, thereby precluding the defendant from appealing his conviction altogether. 528 U.S. at 483-84. The Court held that, to show Strickland prejudice under such circumstances, "a defendant must demonstrate that there is a reasonable probability that, but for counsel's deficient failure to consult with him about an appeal, he would have timely appealed." Id. at 484. The Court opined that "this prejudice standard breaks no new ground." Id. at 485.

Although the unusual scenario at issue in Flores-Ortega is not present in this case, Kennedy, relying on Eleventh Circuit precedent, asserts that Flores-Ortega stands for a broader principle–i.e., "that the prejudice showing required by Strickland is not always fastened to the forum in which counsel performs deficiently: even when it is *trial* counsel who represents a client ineffectively in the *trial court*, the relevant focus in assessing prejudice may be the client's appeal." Davis v. Sec'y of Dep't of Corrs., 341 F.3d 1310, 1315 (11th Cir. 2003) (per curiam) (emphasis in original). But, the Eleventh Circuit later conceded that the "reasoning and the result in Davis arguably were pushing things given what the Supreme Court said in Strickland about measuring the effect of counsel's errors at the guilt stage of a trial against the result of the trial instead of the appeal." Purvis v. Crosby, 451 F.3d 734, 739 (11th Cir. 2006). And, other courts have wholly rejected the Eleventh Circuit's relatively broad interpretation of Flores-Ortega. See Taylor v. United States, 279 F. App'x 368, 369 (6th Cir. 2008) (unpublished); Carratelli v. State, 961 So.2d 312, 322-23 (Fla. 2007). Habeas relief is not warranted under § 2254(d) where, as here, fairminded jurists could disagree over whether the Missouri Court of Appeals' adjudication of Kennedy's claims conflicts with Strickland or Flores-Ortega. Harrington v. Richter, 131 S. Ct. 770, 786 (2011); see Carratelli v. Stepp, 382 F. App'x 829, 832 (11th Cir. 2010) (unpublished per curiam) (explaining that, for the purposes of § 2254 review, "there is no clearly established federal law by the Supreme Court specifically addressing whether the federal court should examine the prejudice on appeal rather than at trial in a case like this one").

## III.  CONCLUSION

We affirm.

_____